[No. B021791. Second Dist., Div. Seven. Sept. 28, 1987.]

RAY ROBINSON, Plaintiff and Appellant, v.
WILLIAM P. McGINN et al., Defendants and Respondents.

**COUNSEL**

Lewis, Marenstein & Kadar and Jean Corey for Plaintiff and Appellant.

Lewis, D'Amato, Brisbois & Bisgaard, Raul L. Martinez and Julianne M. Sweeters for Defendants and Respondents.

**OPINION**

**JOHNSON, J.**—This is an action for legal malpractice brought by Ray Robinson against his former attorney, William P. McGinn, and the law firm of Cadoo, Tretheway, McGinn & Morgan. The court below granted a summary judgment in favor of defendant McGinn and defendant's law firm (hereinafter defendants), holding the statute of limitations had run before appellant had filed his lawsuit. In this appeal we are called upon to determine when appellant suffered irremediable injury and thus the statute commenced running. From the evidence presented in the record, we conclude the trial judge erred in granting defendants' motion for summary judgment, as the harm appellant suffered did not become irremediable until appellant

exhausted his administrative remedies. Therefore, we reverse the trial court's granting of defendants' motion for summary judgment.

## I. *Facts and Proceedings Below*

Appellant, Ray Robinson, was a motorcycle officer for the City of Inglewood Police Department. On February 16, 1977, while Officer Robinson was on duty an automobile collided with his motorcycle. Robinson suffered a separated left shoulder, a broken right ankle, and further injuries to his right foot. As a result of these injuries, appellant was off work for almost 10 months.

Attorney McGinn met with Robinson in Robinson's hospital room the day following the accident. Robinson retained McGinn to represent him in the personal injury claim. He also retained this same lawyer to procure workers' compensation benefits. It was also agreed McGinn would represent him in any claim for a disability pension which might be required should it prove impossible for Officer Robinson to return to work.

During the period of appellant's disability and while receiving disability benefits from the City of Inglewood, appellant began working as a real estate agent. Appellant, prior to beginning these real estate endeavors, discussed with respondent McGinn the fact he had taken a real estate agent licensing test and was interested in selling real estate. Attorney McGinn did not inform appellant that appellant's involvement in real estate would severely prejudice his workers' compensation claim, affect his ability to obtain a disability retirement, or subject appellant to disciplinary proceedings for engaging in work while off duty.

Robinson returned to work on a light-duty basis in December of 1977. Upon his return, Robinson was advised by Police Chief Jay Stroh that his off-duty work as a real estate agent was in violation of Inglewood Police Department rules. Thereafter, Robinson became the subject of an internal affairs investigation. In addition, Robinson was allegedly followed by a private investigating firm, and was severely harassed while at work.

Appellant worked light duty from December 12, 1977, to December 19, 1977. Thereafter he did not return to work, allegedly because of extreme emotional strain caused by the internal affairs investigation, the harassment, and residual physical trauma from his injuries.

On January 25, 1978, Chief Stroh wrote to appellant informing him his absence from work was considered to be due to a psychological condition which was not job related and, thus, appellant was not entitled to disability

benefits. Stroh further informed appellant his sick time would be exhausted on January 29, 1978.

Appellant sought the advice of respondent McGinn. Allegedly on the advice of McGinn, appellant wrote to Chief Stroh on January 28, 1978, informing him he would not be returning to work and would be seeking a retirement.

On February 8, 1978, Captain Augusta of the Inglewood Police Department wrote to appellant commanding him to immediately return to work on a light duty basis. Appellant did not return to work.

Respondent McGinn wrote a letter to Captain Augusta on February 15, 1978, confirming Robinson's intention to terminate his relationship with the police department. The letter, however, indicated appellant's actions were without prejudice to apply for a disability pension.

Appellant, acting on the advice of respondent McGinn, wrote to the Public Employees Retirement Fund on March 3, 1978, requesting a refund of his pension contributions. The City of Inglewood interpreted this letter as expressing appellant's intent to resign, since the withdrawal of contributions from a pension is inconsistent with continued employment.

On March 15, 1978, appellant, dissatisfied with respondent McGinn's representation of him in his workers' compensation disability and pension matters and on the advice of a fellow police officer, substituted new counsel to represent him in these matters. In addition, appellant requested his new counsel to represent him in determining his employment status with the City of Inglewood. However, McGinn continued to handle Robinson's personal injury action.

On March 15, 1978, appellant's new law firm wrote Chief Stroh asking that Robinson be reinstated. This firm claimed Robinson's prior letter did not in fact constitute a resignation, and he was willing to accept a light duty position. In addition, appellant, on the advice of his new counsel, wrote a letter retracting his prior request for his pension contributions.

From the initial day of substitution (Mar. 15) until September 27, 1978, appellant's new counsel corresponded frequently with various people including Chief Stroh, the Inglewood City Administrator, and the Inglewood City Attorney, attempting to have appellant's employment status and right to a disability pension determined by the City of Inglewood. Continually frustrated in their efforts, appellant's new lawyers filed a petition for writ of mandate in the Los Angeles Superior Court on October 30, 1979. The writ

of mandate requested the court to compel the city to comply with Government Code section 21020[1] and either give appellant a pension hearing or, alternatively, to reinstate him to a position with the city which he was medically capable of performing. While waiting for his petition to be heard, appellant informed his new counsel that *if* his disability pension was denied by the city, he wished to proceed against respondents in a legal malpractice action.

On July 18, 1980, appellant's motion for peremptory writ of mandate was heard by Judge Harry Hupp. Judge Hupp ordered the city council to hold a hearing as mandated by the Government Code. Secondly, Judge Hupp ruled appellant had *resigned* from the police department.

In the meantime, appellant had filed a legal malpractice lawsuit in the superior court on April 30, 1980. However, it was not served until January 1981, after the city council finally concluded its hearing pursuant to Government Code section 21025.[2] At this hearing the city council decided appellant was not incapacitated physically or mentally for the performance of his duties as an Inglewood police officer and consequently was ineligible for a pension.

After initially demurring because appellant's malpractice complaint was too vague, respondents answered appellant's first amended complaint on February 3, 1982. On July 30, 1984, respondents filed a motion for summary judgment based on the statute of limitations. The trial court granted respondents' summary judgment motion as to that part of appellant's complaint which was based on the loss of his disability pension. (The trial court held triable issues existed regarding the timeliness of Robinson's product liability suit, which was subsequently tried and decided in Robinson's favor and was later settled, bringing the products liability claim to a final conclusion.)

---

[1] Government Code section 21020 provides as follows: "As used in this part, 'disability' and 'incapacity for performance of duty' as a basis of retirement, mean disability of permanent or extended and uncertain duration, as determined by the board, or in the case of a local safety member by the governing body of the contracting agency employing such member, on the basis of competent medical opinion."

[2] Government Code section 21025 provides: "If the medical examination and other available information show to the satisfaction of the board, or in case of a local safety member the governing body of the contracting agency employing such member, that the member is incapacitated physically or mentally for the performance of his duties in the state service and is eligible to retire for disability, the board shall forthwith retire him for disability, unless the member is qualified to be retired for service and applies therefor prior to the effective date of his retirement for disability or within 30 days after the member is notified of his eligibility for retirement on account of disability, in which event the board shall retire the member for service. The governing body of a contracting agency upon receipt of the request of the board pursuant to Section 21024 shall certify to the board its determination under this section that the member is or is not so incapacitated."

## DISCUSSION

■ The primary issue before us is when did the statute of limitations commence running on appellant's claim for legal malpractice. It is undisputed the statute of limitations does not begin to run until an appellant sustains "actual harm." The dispute in the instant case is did Robinson suffer "actual harm" when the individual city officials (e.g., Chief Stroh) denied appellant reinstatement of his job and the right to a disability pension or did appellant not sustain "actual harm" until the city held the administrative appeal to which he was legally entitled and ruled against him on the employment and disability pension issue.

Appellant claims he did not sustain "actual damage" until the harm became irremediable. The harm, in turn, did not become irremediable until he exhausted his administrative appeal remedy and this appeal was finally decided against him. Therefore, appellant contends, the trial court erred in granting respondent's summary judgment motion on statute of limitation grounds. We agree.

II. ■ *The Statute of Limitations Does Not Begin to Run Until the Client Sustains Actual and Appreciable Harm, Even if the Client Knows His Lawyer Improperly Handled the Case.*

In cases of legal malpractice, California follows the rule that the cause of action accrues when the client (a) discovers, or reasonably should have discovered, an actionable claim for legal malpractice exists (*Neel* v. *Magana, Olney, Levy, Cathcart & Gelfand* (1971) 6 Cal.3d 176 [98 Cal.Rptr. 837, 491 P.2d 421]), *and* (b) when the client begins to suffer appreciable and actual harm as a result of the malpractice; *Bledstein* v. *Superior Court* (1984) 162 Cal.App.3d 152, 170 [208 Cal.Rptr. 428]; *Bell* v. *Hummel* (1982) 136 Cal.App.3d 1009 [186 Cal.Rptr. 688]; *Southland Mechanical Constructors Corp.* v. *Nixen* (1981) 119 Cal.App.3d 417 [173 Cal.Rptr. 917]; *Electronic Equipment Express, Inc.* v. *Donald H. Seiler & Co.* (1981) 122 Cal.App.3d 834, 848 [176 Cal.Rptr. 239]; *Budd* v. *Nixen* (1971) 6 Cal.3d 195 [98 Cal.Rptr. 849, 491 P.2d 433]; (Code Civ. Proc., § 340.6).[3]

As the above cases illustrate, even if a client in fact *knows* his attorney mishandled his case, the statute of limitations will not begin to run until the

---

[3] Code of Civil Procedure section 340.6 provides in pertinent part: "(a) An action against an attorney for a wrongful act or omission, other than for actual fraud, arising in the performance of professional services shall be commenced within one year after the plaintiff discovers, or through the use of reasonable diligence should have discovered, the facts constituting the wrongful act or omission, or four years from the date of the wrongful act or omission, whichever occurs first. In no event shall the time for commencement of legal action exceed four years except that the period shall be tolled during the time that any of the following exist: [¶] (1) The plaintiff has not sustained actual injury; . . ."

client suffers actual harm. This theory was first articulated in *Budd* v. *Nixen* where the California Supreme Court noted a client may ". . .discover his attorney's negligence without having suffered any consequential damage." (*Budd* v. *Nixen, supra,* 6 Cal.3d at p. 201.) The Court also observed: "If the allegedly negligent conduct does not cause damage, it generates no cause of action in tort. [Citation omitted.] The mere breach of a professional duty, causing only nominal damages, speculative harm, or the threat of future harm—not yet realized—does not suffice to create a cause of action for negligence. [Citations omitted.] Hence, until the client suffers appreciable harm as a consequence of his attorney's negligence, the client cannot establish a cause of action for malpractice." (Fn. omitted.) (*Budd* v. *Nixen, supra,* 6 Cal.3d at p. 200.)

■ Here the appellant never admitted he knew he had a cause of action for legal malpractice. At best, it could be argued, the appellant was aware of a *potential* malpractice claim against the respondents. However, even if appellant knew he had a cause of action ". . . it is black-letter law that damages may not be based upon sheer speculation or surmise, and the mere possibility or even probability that damage will result from wrongful conduct does not render it actionable. [Citations omitted.]" (*Ventura County Humane Society* v. *Holloway* (1974) 40 Cal.App.3d 897, 907 [115 Cal.Rptr. 464].)

Thus it is firmly entrenched in our state law that the statute of limitations in a legal malpractice claim does not begin to run simply when the client knows, or should know, of the attorney's negligence. The client must also suffer harm. The respondents repeatedly bang the drum claiming appellant was aware of Attorney McGinn's alleged negligent handling of his case. However, these notes ring hollow. Unless it can be shown appellant, in addition to having knowledge of respondents' negligence, had sustained actual and appreciable harm the statute of limitations is tolled. What constitutes actual and appreciable harm is the next issue we must resolve.

III. ■ *The Statute of Limitations on a Legal Malpractice Action Does Not Begin to Run Until The Lawyer's Negligence Which Caused the Harm Becomes Irremediable.*

Respondents argue appellant sustained actual harm in 1978 when, as a result of Attorney McGinn's alleged negligent advice, appellant sent a letter to the City of Inglewood which was construed as a resignation. As a result of this letter, appellant lost his job as an Inglewood police officer and, in addition, "prejudiced" his ability to obtain a disability pension. Respondents also claim appellant sustained actual injury when his real estate earnings were credited against his workers' compensation benefits. Respondents

contend appellant was aware of the damages this letter had caused him as evidenced by his response to interrogatories.

However, these contentions ignore past decisions from courts in this state which have held that harm is "actual and appreciable" only if and when it becomes "irremediable." (See *Bell* v. *Hummel, supra,* 136 Cal.App.3d 1009, 1016-1017; *Southland Mechanical Constructors Corp.* v. *Nixen, supra,* 119 Cal.App.3d 417, 432-433; *Heyer* v. *Flaig* (1969) 70 Cal.2d 223, 225 [74 Cal.Rptr. 225, 449 P.2d 161].) "Irremediable," by definition, means something which is impossible to remedy; something which is lost, or incorrigible.

In the case at bar, we hold the appellant's injuries were not irremediable until final administrative adjudications were made regarding his employment status and his right to receive a disability pension. If, for example, the hearing committee had awarded appellant the disability pension which appellant claimed he was entitled to, appellant would have suffered no actual harm as a result of respondents' alleged negligence.

The above reasoning is consistent with past court decisions not only in this state but in other jurisdictions, too. In a case very analogous to the one before us today (*Bell* v. *Hummel, supra,* 136 Cal.App.3d 1009) the defendant attorney failed to assert a valid cause of action on the appellant's behalf against a doctor for medical malpractice. The appellant admitted he discovered the possible legal malpractice early on. Yet this did not imply he sustained "actual harm" at that time. The *Bell* court explained, ". . . [A]ppellant admits, . . . that he discovered the possible legal malpractice in November 1977. However, until he had suffered actual damages, the running of the statute of limitations was tolled. . . ." (*Id.,* at pp. 1016-1017.) As in the instant case, the plaintiff in *Bell* went to a new lawyer who sought to rectify the problem, in that instance by seeking to join the plaintiff's claim with his wife's claim. The court found Mr. Bell's *actual injury* did not occur until the trial court denied his motion to amend the complaint to add his name. It held: "[T]he impact and accrual of the damages [did not occur until] the new attorney failed in his attempt to rectify the previous mistake. . . .Until the court denied appellant the right to join his wife's complaint as a coplaintiff in order to assert his claims arising from the alleged medical malpractice, his damage had not fully accrued. It was not until then that his claims were *lost* and the *full impact of the wrongful acts settled leaving damage that was for all practical purposes irremediable.* Prior to that time appellant had only seen that his attorney had committed an error, but *no appreciable harm had resulted from the error until it could not be rectified,* i.e., could not be remedied or cured. Up until that time, his damage

was prospective and the statute of limitations was tolled. [Citations omitted.]" (*Ibid.,* at pp. 1016-1017, italics added.)

In *Bell* the harm did not become "actual" until the new lawyer's attempts to rectify the malpractice through judicial action proved unavailing. We see no reason to reach a different conclusion merely because the new lawyer in the instant case sought to rectify the defendant's alleged malpractice through administrative rather than judicial action. The appellant here had a due process and statutory right to a hearing on his employment status and pension claim. Therefore, the statute of limitations was tolled while the appellant pursued the administrative remedies which were available to him as a matter of right. Only when the appellant had exhausted his administrative remedies did the limitation period begin to run. (*Valvo v. University of Southern California* (1977) 67 Cal.App.3d 887, 894 [136 Cal.Rptr. 865]; see also *Olson v. County of Sacramento* (1974) 38 Cal.App.3d 958 [113 Cal.Rptr. 664] and cases cited therein.)

Similarly, in *Southland Mechanical Constructors Corp.* v. *Nixen, supra,* 119 Cal.App.3d 417, the defendant-attorneys negligently processed a claim the plaintiff subcontractors made against the government. Due to the attorneys' negligence, the plaintiffs lost their right to receive additional compensation for work they had completed on a project for the Army Corps of Engineers. The defendant attorneys were negligent in handling the claim between April 1973 and January 29, 1976, when the attorneys received the Army's final decision completely denying the claim. The Army notified the attorneys they had 30 days after receipt of the final decision to appeal. Since no appeal was filed, the Army's decision became "legally conclusive" on February 28, 1976. The court held the plaintiffs suffered actual injury on February 28, 1976, the date when the plaintiffs *lost their right to appeal* and this was the date the plaintiffs' legal malpractice claim was held to have accrued. The court stated, "It is our view that the damage to plaintiffs, because of the attorney defendants alleged error, *became irremediable on February 28, 1976, the last date on which an administrative appeal could be filed.* At this point, plaintiffs *lost* their right to compensation *from the government,* the exact purpose for which attorney defendants were hired." (*Id.,* at p. 433, italics in original and italics added.)

Turning to other jurisdictions, we find a similar definition of when a client experiences "actual harm" where he is pursuing a remedy which might rectify the problem created by his lawyer's malpractice. In *Bowman v. Abramson* (E.D.Pa. 1982) 545 F.Supp. 227, a client sued his attorneys for legal malpractice. The client claimed the attorneys were negligent in handling two medical malpractice actions. Summary judgment was entered against the client in the medical malpractice cases. The client retained new

counsel to appeal the summary judgments. While those appeals were pending, the client also instigated the legal malpractice suit against his former attorneys. The court dismissed the case concluding there was no actual controversy between the parties. "Until the underlying medical malpractice cases are decided adversely to the plaintiff the case against his former attorneys is hypothetical and his damages are speculative." (*Id.,* at p. 228.) The court also said the plaintiff did not show he had been damaged, "because his medical malpractice cases are still pending." (*Id.,* at p. 229.) In sum, the court found the plaintiff had not yet sustained actual damages.

In *AMFAC Distribution Corp.* v. *Miller* (1983) 673 P.2d 795, the Arizona Supreme Court affirmed the Court of Appeals of Arizona, holding that: "Where there has been no *final adjudication* of the client's case in which the malpractice allegedly occurred, the element of injury or damage remains speculative and remote, thereby making premature the cause of action for professional negligence." (*Id.,* at p. 796, italics added; see also *Simmons* v. *Ocean* (D.V.I. 1982) 544 F.Supp. 841 [cause of action accrues when the negligence becomes "irreversible" thus leaving the plaintiff with "*no* remaining recourse."], italics added.)

The above cases all stand for the proposition the harm suffered must be irremediable before the statute of limitations begins to run in a legal malpractice suit. In the case at bar, appellant's harm was not irremediable until an adverse final adjudication was made on his claim for pension benefits in 1981 and not until the city council, in 1980, resolved his employment status with the City of Inglewood.

Cases which the respondents cite for the proposition appellant suffered actual and appreciable harm are distinguishable because in those cases the harm was in fact irremediable. For example, respondents cite *Davies* v. *Krasna* (1975) 14 Cal.3d 502 [121 Cal.Rptr. 705, 535 P.2d 1161, 79 A.L.R.3d 807]. *Davies* involved an action by the executrix of a deceased writer's estate against a producer of plays and motion pictures. In 1951, the writer, Valentine Davies, had given the producer a written story *in confidence.* In November of 1955, Davies discovered his story had been disclosed to various people in the entertainment industry. However, Davies did not file suit until November 1959. The Court in *Davies* properly held the suit was barred by the statute of limitations. Davies in fact suffered actual and appreciable harm in November of 1955 when he learned his *confidential communications* were disclosed to various people in the entertainment industry, and thus his confidential communications were no longer, and could never again, be confidential. In contrast, appellant's harm was remediable until the required hearing was held. Prior to the conclusion of the hearing,

appellant's rights had not been established and therefore he had not sustained irremediable harm.

IV. ■  *Although the Statute of Limitations Is Favored by the Law as a Meritorious Defense, Tolling the Statute Is Proper When Administrative Remedies Exist.*

" 'It is fundamental that the primary purpose of statutes of limitation is to prevent the assertion of stale claims by plaintiffs who have failed to file their actions until evidence is no longer fresh and witnesses are no longer available. "[T]he right to be free of stale claims in time comes to prevail over the right to prosecute them." [Citations omitted.] The statutes, accordingly, serve a distinct public purpose, preventing the assertion of demands which through the unexcused lapse of time, have been rendered difficult or impossible to defend.' " (Citations omitted.) (*Electronic Equipment Express, Inc.* v. *Donald H. Seiler & Co., supra,* 122 Cal.App.3d 834, 844.)

Respondents contend that to allow appellant to go forward with his suit would be contrary to the policy reasons behind statutes of limitation. In addition, respondents argue the appellant, or any clients who are unhappy with their lawyer's performance, should, within one year, file a lawsuit against that lawyer and then stay the lawsuit pending the accrual of actual damages. We disagree with the respondents on both of the above contentions.

Any person who has participated in our court system has to be aware of the ever-increasing case loads threatening to engulf our trial courts. While the respondents' proposal might protect defendants from some stale claims, it would further burden our existing overly crowded court calendars with the filing of potentially meritless lawsuits by plaintiffs waiting to learn whether they indeed will be suffering irremediable harm. (It likewise might well compel defendants to investigate many such cases which would never be pursued beyond the initial filing of the complaint.)

In discussing the "practical purpose" the statutes serve in our legal system, the California Supreme Court in *Davies* stated, "Modern adjustments in limitations law, however, have reflected concern for the practical needs of prospective plaintiffs. . . .Impelled by this concern for the pragmatic, we have drifted away from the view held by some that a limitations period necessarily begins when an act or omission of defendant constitutes a legal wrong as a matter of substantive law. [Citation omitted.] Rather, we generally now subscribe to the view that the period cannot run before plaintiff possesses a true cause of action, by which we mean that events have developed to a point where plaintiff is entitled to a legal remedy . . . ." (*Davies*

v. *Krasna, supra,* 14 Cal.3d 502, 512-513.) The *Davies* court went on to suggest that victims of attorney malpractice should take some steps to mitigate any harm suffered and to avoid further harm but, "[c]oncededly, this principle does not require injured parties to take expensive and burdensome steps to minimize their losses (citation omitted), and *certainly legal action is not typical of the kinds of behavior which courts expect of such victims.*" (*Id.,* at p. 515, italics added.) In the case at bar, we consider that appellant's new law firm took appropriate steps calculated to minimize the burdens on both the judicial system and the parties. These lawyers attempted to obtain a ruling on appellant's employment status and a hearing on his disability pension rights in the administrative arena which could well have rectified the problems created by defendants' alleged malpractice and rendered the instant judicial action unnecessary.

V. ■ *Appellant's Filing of a Chapter 7 Petition for Bankruptcy While His Attorney Malpractice Case Was Pending Did Not Deny Him Standing to Bring This Action, Absent Assertive Action by the Trustee in Bankruptcy.*

On July 19, 1982, nearly 27 months after initially commencing the attorney malpractice action, appellant filed a Chapter 7 petition for bankruptcy in the United States Bankruptcy Court, Eastern District of California. Because appellant filed for bankruptcy, respondents contend any right to recover damages belonged to the trustee in bankruptcy, and accordingly appellant lacks standing to bring this action. We disagree.

In support of their contention, respondents repeatedly reiterate the frequently stated passage that, "[u]pon the filing of a petition for bankruptcy all of the debtor's assets, including any interest in a cause of action, pass to the trustee in bankruptcy. [Citations omitted.]" (*People* v. *Kings Point Corp.* (1986) 188 Cal.App.3d 544, 548 [233 Cal.Rptr. 228].) However, respondents failed to consider the language in *Kaley* v. *Catalina Yachts* (1986) 187 Cal.App.3d 1187 [232 Cal.Rptr. 384], a case recently decided by this division of the Court of Appeal.

In the *Kaley* case we recognized a cause of action becomes part of the bankruptcy estate when a petition for bankruptcy is filed. Yet, immediately following this observation, we held: "However, the transfer, by operation of law, does not divest the plaintiff of his right to continue to prosecute the action, pending assertive action by the representative of the estate, the trustee in bankruptcy. [Citation omitted.] The trustee may, among other things, allow the plaintiff to pursue the action and await the results,. . . ." [Fn. omitted; citations omitted.] (*Id.,* at p. 1194.) In the case at bar, the record is devoid of any evidence to demonstrate the trustee in bankruptcy

or the bankruptcy court ever took any "assertive action" over the appellant's attorney malpractice lawsuit. This is true despite the fact appellant disclosed his attorney malpractice claim in his petition for bankruptcy. ". . .[I]f the asset is duly listed in bankruptcy schedules, knowledge by the trustee of its existence is clear." (*Wood* v. *Lowe* (1974) 39 Cal.App.3d 296, 300 [114 Cal.Rptr. 69].)

Perhaps even more damaging to respondents' contention appellant lacks standing to bring the instant action is their complete failure to consider Code of Civil Procedure section 385.[4] As stated in the *Kaley* case at page 1195, "Code of Civil Procedure section 385 expressly authorizes the plaintiff to remain the real party in interest even after the cause of action has been transferred to the estate by operation of law, . . . ." Although Code of Civil Procedure section 367 provides that, "Every action must be prosecuted in the name of the real party in interest, . . ." we hold now as we did in *Kaley,* that a trustee in bankruptcy is not the real party in interest until he formally intervenes *and* is allowed to substitute into the pending action previously brought by the bankrupt.

It should be noted, however, simply because the trustee in bankruptcy permits the bankrupt to pursue a pending action in his own name, does not necessarily mean the bankrupt will be allowed to retain the recovery.[5] Any recovery received by the bankrupt may, depending on the facts of the individual case, first be used for the benefit of the estate.

Respondents argue in the alternative that if we rule appellant does have standing to bring the attorney malpractice action, any recovery should be limited to $7,550, the value appellant apparently placed on his malpractice case when filing his petition for bankruptcy. We assume this valuation was

[4] Code of Civil Procedure section 385 provides in pertinent part: "(a) An action. . .does not abate. . .by the transfer of any interest therein, if the cause of action survives or continues. . . .In case of. . .transfer of interest, *the action. . .may be continued in the name of the original party,* . . . ." (Italics added.)

[5] We note under United States Code Annotated, Title 11, section 522(d) that various assets or benefits the bankrupt may have a right to receive can be exempted from the estate. Under section 522(b) of that same code these exemptions may be defined by state law. California has enacted section 703.130 of the Code of Civil Procedure expressly choosing to opt out of the federal bankruptcy exemptions. Instead, the State of California has by statute enacted its own exemption plan. It is pertinent to point out that under California law exemptions exist for public retirement benefits (Code Civ. Proc., § 704.110), disability benefits (Code Civ. Proc., § 704.130), and for personal injury causes of action, damages or settlement (Code Civ. Proc., § 704.140). Since the instant lawsuit is a malpractice action where damages sought are largely composed of lost retirement benefits, it is not inconceivable the recovery could be considered "retirement benefits" for purposes of the bankruptcy exemptions. However, we have no reason to resolve this question today since it is not necessary to resolution of the issues raised in this appeal.

based on the amount of damages sought discounted by a rough prediction about the probability of success. We see no reason to impose this as a *maximum* cap on appellant's permissible recovery should he be so fortunate as to exceed his own expectations in this lawsuit. Pessimism is its own punishment; there is no need for us to add a further penalty.

## DISPOSITION

The judgment is reversed and the case remanded for further proceedings consistent with this opinion. Appellant to receive his costs on appeal.

Lillie, P. J., and Thompson, J., concurred.

A petition for a rehearing was denied October 23, 1987, and respondents' petition for review by the Supreme Court was denied December 22, 1987.